UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANTOINE YATES,

                    Plaintiff,

      -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE OFFICER ORTIZ, Shield #7879 and NEW
YORK CITY POLICE OFFICERS JANE/JOHN
DOE,

                    Defendants.
------------------------------------------------------------------x

04 Civ. 9928 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

## I.    Introduction

The word chutzpah, despite not debuting in a reported judicial opinion until 1972,[1] is now vastly overused in the legal literature.[2] Yet in a case such as this – in which an individual, after being mauled by the 450-pound Siberian tiger he had been raising inside his fifth-floor apartment along with an alligator, sues the city and the police who entered the apartment in an effort to rescue the animals for doing so without a search warrant – it is a most appropriate term to use.

Antoine Yates claims that the police department's confiscation of his tiger and alligator, and their search of his apartment for evidence of ownership of these and other exotic animals the

---

[1] As indicated by a search of Lexis and Westlaw; see also Alex Kozinski and Eugene Volokh, Lawsuit, Shmawsuit, 103 Yale L.J. 463, 463 (1993) (identifying the Georgia Court of Appeals decision in Williams v. State, 190 S.E.2d 785, 785 (Ga. App. 1972) as the first reported case to use the term). The Williams court, after noting that "[t]he classic definition of 'chutzpah' is that quality enshrined in a man, who having killed his mother and father, throws himself upon the mercy of the court because he is an orphan," found the term appropriate to describe the defendant's act of breaking into the sheriff's office inside the courthouse to steal guns. Williams, 190 S.E.2d at 785.

[2] According to Lexis, the word in all its variants – "chutzpah," "chutzpa," "hutzpah," or "hutzpa" – has appeared in 214 cases since 1996; see generally Jack Achiezer Guggenheim, The Evolution of Chutzpah as a Legal Term: The Chutzpah Championship, Chutzpah Award, Chutzpah Doctrine, and Now, the Supreme Court, 87 Ky. L.J. 417 (1999). The word is also used fulsomely outside the legal realm. See, e.g., Andrew Goldstein, How Much Chutzpah Do They Have?, Time, Aug. 21, 2000; William Safire, On Language: Chutzpah at Camp Greentop, N.Y. Times Mag., Mar. 18, 1990, at 12.

next day, violated his constitutional rights. He also alleges that during these searches, police officers stole his pet rabbit and several thousand dollars in cash and jewelry. Defendants – the City of New York and one of the police officers involved in entering the apartment – have moved for summary judgment in their favor following the conclusion of discovery proceedings. They assert that the police had probable cause to enter and search the apartment (after learning that the tiger had bitten off a chunk of plaintiff's leg) and that, among other reasons, this Court should not exercise jurisdiction over plaintiff's state law claim of conversion of the cash and jewelry. For the reasons set forth below, defendants' motion is granted.

**II.  Background**

The following facts are undisputed, except as otherwise noted. In the early afternoon of October 1, 2003, Antoine Yates was mauled by his pet 10-foot-long, 450-pound adult male Siberian tiger named Ming that Yates had been raising inside his fifth floor Harlem apartment. (Defs.' Rule 56.1 ¶¶ 1, 52; Oct. 4, 2003 Report of Michael Polito ("Polito Oct. 4 Report"), Ex. G to Decl. of Vivian Najib dated Aug. 12, 2005 ("Najib Decl."); Deposition of Antoine Yates dated June 20, 2005, Ex. A to Najib Decl. ("Yates Dep.") at 119:20-23, 121:20-22.) An anonymous caller twice dialed 911 and said that a man had been "bitten by dog" at Yates's address, 2430 Seventh Avenue, Apartment 5E. (Defs.' Rule 56.1 ¶¶ 8-9; Yates Dep. at 118:5-9; Oct. 9, 2003 Report of Michael Polito, Ex. JJJ to Najib Decl. ("Polito Oct. 9 Report").) Police officers responded to the apartment building, which was owned and operated by the New York City Housing Authority, and found Yates "lying face-up on the floor" near the fifth story elevators "screaming and crying in pain." (Defs.' Rule 56.1 ¶¶ 10-12; Polito Oct. 9 Report.) His wounds included a gash below his right knee that exposed the bone and a half-inch cut to his right forearm. (Defs.' Rule 56.1 ¶ 20; Yates Dep. at 110:12-23.) Yates told the officers he had been

2

bitten by "a large brown and white pit bull." (Defs.' Rule 56.1 ¶ 14; Polito Oct. 9 Report.) EMS personnel arrived on the scene and took Yates to Harlem Hospital; all the while, Yates continued to insist that a "pit bull" or "dog" had bitten him. (Id. ¶¶ 15-18; id.)

Two days later, on October 3, the New York City Police Department ("NYPD") received an anonymous tip that a tiger was living inside 2430 Seventh Avenue, Apartment 5E, and that the tiger had mauled a man who was recuperating at Harlem Hospital. (Defs.' Rule 56.1 ¶ 25; Memo from Executive Officer, PSA-6, dated Oct. 12, 2003, Ex. KKK to Najib Decl.) Officers responded to the location but did not enter the apartment because no one answered the door. (Id. ¶ 26; id.) Later that evening, the police returned to the building and interviewed one of Yates's neighbors, who said that there was "a large wild animal," apparently a "full-grown tiger," living in Yates's apartment. (Defs.' Rule 56.1 ¶ 30; Polito Oct. 4 Report.) The neighbor said that Yates had shown the animal to her daughter and that "large amounts of urine" sometimes cascaded from Yates's window down into the window of her apartment. (Polito Oct. 4 Report.)

The police also went to Harlem Hospital to speak with Yates, who insisted that he had been bitten by a pit bull in the stairwell of his residence and that he did not own a tiger. (Defs.' Rule 56.1 ¶¶ 31-34.) At midnight, NYPD Captain Michael Polito interviewed Yates's brother Aaron, who said that Yates had both a fully-grown tiger and a large alligator living inside his apartment. (Id. ¶ 35.) Aaron also said that on the night before, he had opened the door to his brother's apartment, thrown in several pieces of raw chicken and watched as the tiger came toward the food. (Id. ¶ 36.) He added that Yates had acquired the tiger when it was a cub, about one-and-a-half to two years ago, and had raised the tiger in the apartment since then. (Polito Oct. 4 Report.) Polito notified the NYPD's Emergency Services Unit ("ESU") that there was reason

3

to believe that a large dangerous animal was living inside Apartment 5E. (Id.; Defs.' Rule 56.1 ¶ 38.)

At approximately 1 a.m. on October 4, ESU officers arrived at Yates's address. (Defs.' Rule 56.1 ¶ 39.) In an attempt to determine – without entering the apartment – if, in fact, a tiger were inside, the officers removed the peephole in the apartment's front door and also lowered cameras from the windows of the apartment directly above Yates's. (Defs.' Rule 56.1 ¶ 40; Polito Oct. 4 Report.) However, the officers could not see the tiger. (Polito Oct. 4 Report.) An hour later, two directors of the Center for Animal Care and Control ("CACC"), which advertises itself as "the only animal care organization in New York City that never turns away animals," arrived and told the officers that CACC did not have the ability to transport or house the tiger. (Id.; http://www.nycacc.org.) The NYPD contacted a veterinarian at the Bronx Zoo, who said that the zoo also did not have the personnel or means to transport a fully-grown tiger from a fifth floor apartment. (Polito Oct. 4 Report.) Unable to confirm the presence of the tiger and without a means for moving it out, the NYPD re-secured the apartment's front door and stationed two officers at the door to stand guard. (Id.) At around the same time, Yates left Harlem Hospital against the advice of his doctors and approached his apartment – but did not go inside because of the police officers there – and then spent the night at a friend's apartment. (Defs.' Rule 56.1 ¶¶ 47-48; Yates Dep. at 179:1-20.) The next morning he hied off to Philadelphia. (Yates Dep. at 179:24-25.)

The police proceeded to hold several strategy meetings in which, according to Chief of Police John Seymour, they determined that the situation was an "emergency" because "there was a large tiger roaming around inside an apartment" and "the tiger had recently mauled a man." (Decl. of Chief John Seymour dated Aug. 11, 2005 ¶¶ 4-8, Ex. GGG to Najib Decl.) Seymour

said that the police also determined that there was "an urgent need to remove the animal from the apartment" because of "concerns for the safety of residents of the apartment building and the safety of people in the area surrounding the apartment building" as well as concern for the "safety of the animal itself." (Id.) After consulting several agencies with experience in dealing with wild animals, the police, unsurprisingly, concluded that the best option was to tranquilize the tiger before attempting to remove it. (Id. ¶¶ 9-12.)

The NYPD began the removal operation on the afternoon of October 4. (Defs.' Rule 56.1 ¶¶ 62-64.) In order to pinpoint the tiger's location inside the apartment, officers raised a camera from the apartment beneath Yates's to look through Yates's windows, inserted a second camera into the peephole in Yates's front door and cut through one of the apartment's walls in order to conduct a "room by room tactical search." (Id. ¶ 62-65.) After Ming – along with a large alligator – was located by the window camera, the police stopped the room-by-room search, sealed the apartment and spoke with several experts in animal rescue who were on location, including Robert Cook, the Chief Veterinarian of the Wildlife Conservation Society, to determine what to do next. (Id. ¶¶ 70-71; Polito Oct. 4 Report.)

In a maneuver that police and Cook say was intended to minimize the risk to the tiger and to those in the area (see Affidavit of Robert Cook dated Feb. 10, 2004, Ex. E to Najib Decl.), an NYPD officer rappelled off the side of the building from a seventh-floor window and, through a half open window of Yates's apartment, shot Ming with a tranquilizer dart. (Defs.' Rule 56.1 ¶¶ 84, 90.) Ming charged at the window, breaking the glass, and then ran through the apartment, hid in another room and fell unconscious fifteen minutes later. (Id. ¶¶ 91-94.) Several ESU officers, along with members of the Wildlife Conservation Society, entered the apartment to remove Ming and the six-foot-long alligator, both of which were transported to an animal refuge

5

area. (Id. ¶¶ 97, 101-102.) The police canvassed the building in search of other wild animals, did not find any, and then exited the apartment, leaving it under the supervision of the New York City Housing Authority. (Defs.' Rule 56.1 ¶¶ 108, 109, 111; Investigation Report, Ex. K to Najib Decl.) The entire rescue was videotaped. (See Exs. DDD, EEE and FFF to Najib Decl.)

That evening, New York City police detective Jose Ortiz, the only defendant identified by name in the complaint, traveled to Philadelphia to interview Yates, who had been admitted to University of Pennsylvania Hospital for continued treatment of his injuries. (Defs.' Rule 56.1 ¶¶ 112, 115.) Yates told Ortiz that he had purchased Ming from a woman in Minnesota for $3,500; that he had owned "many wild animals in the past, including monkeys, alligators and scorpions"; and that he had lied to medical personnel about what had caused his wounds. (Reckless Endangerment Report dated Oct. 4, 2003, Ex. L to Najib Decl.) Yates insisted that the only animals he currently possessed were Ming and the alligator. (Id.) He had raised the alligator – whose piquant name was Al – for about eight years, since it was a mere hatchling. (Yates Dep. at 134:20-135:5.)

Detective Ortiz applied the next day for a warrant to search the apartment. (Defs.' Rule 56.1 ¶ 117.) In his affidavit to the state court in support of the warrant, Ortiz attested that

> there is reasonable cause to believe that the following property may be found: documents of ownership of and purchasing of exotic animals, medical record for exotic animals, enclosures or cages for exotic animals and evidence of the crimes of Reckless Endangerment, PL 120.25, and Possession of a Wild Animal, NYCC 161.01, including but not limited to:
> a. evidence of ownership, maintenance, health care, and expenses of exotic animals including but not limited to … receipts for goods and services tending to demonstrate cash transactions or financial transfers relating to the possession of exotic animals….

(Affidavit of Jose Ortiz in Support of Search Warrant dated Oct. 5, 2003 ¶ 2, Ex. Q to Najib Decl.) Based on this information, Acting New York State Supreme Court Justice Michael Obus

6

signed the search warrant, which noted that there was "reasonable cause to believe" that documents and other things related to the ownership and purchasing of exotic animals "may be found" at Yates's apartment. (Search Warrant, Ex. R to Najib Decl.) The warrant commanded the NYPD to enter Yates's apartment between 6 a.m. and 9 p.m. and search for the following:

> a. documents of ownership of and purchasing of exotic animals, records relating to the purchasing of food and feeding of exotic animals, medical records for exotic animals, enclosures or cages for exotic animals;
> b. evidence of ownership and use of the target premises to possess exotic animals, or the use of property located therein by any person, including but not limited to keys, telephone bills, utility bills, bank statements, leases, deeds, or rent receipts related to the target premises or other real property….

(Id.) The warrant also authorized the police to videotape and photograph the interior of the apartment, retrieve electronic communications and computer disks and look for fingerprints. (Id.)

Detective Ortiz and three other NYPD officers searched Yates's apartment in the early evening of that day, October 5. (Defs.' Rule 56.1 ¶¶ 124-127.) The officers recovered pictures of the tiger, nine bullets, a certificate of veterinary inspection, receipts indicating that Yates had purchased a tiger and two lions in 2001 and other assorted papers. (Id. ¶ 129; Affidavit of John Fitzpatrick in Support of Search Warrant dated Oct. 10, 2003 ¶ 7, Ex. JJ to Najib Decl.) The police also collected several blood samples. (Defs.' Rule 56.1 ¶ 130.) The search lasted less than two hours. (Id. ¶ 134.)

The day after the search, an official with the New York City Housing Authority changed the lock on the door and secured the key in the housing office safe. (Id. ¶ 135.) Detective Ortiz returned to Philadelphia to arrest Yates for reckless endangerment and bring him back to New York. (Id. ¶¶ 137-139; Complaint dated Oct. 6, 2003, Ex. I to Najib Decl.)

On October 8, Yates returned to his apartment for the first time since the mauling a week earlier. (Defs.' Rule 56.1 ¶ 143; Yates Dep. at 166:1-11.) He was accompanied by his attorney, Detective Ortiz, an assistant district attorney and others. (Defs.' Rule 56.1 ¶ 143.) After looking through his bedroom, Yates said that he was missing $7,000 in cash that had been wrapped inside papers on his desk, as well as more than $30,000 worth of jewelry. (Yates Dep. at 139:11-23 and 155:7-165:7; Consent to Search dated Oct. 10, 2003, Ex. H to Najib Decl.) He later said that his brown, three-to-four pound "dwarf rabbit" was also missing, along with some clothing, his "plasma TV," a DVD player, a stereo and a "manuscript" he had written. (Yates Dep. at 167:1-5; 201:4-21; 204:21-25; 206:5-9; Plaintiff's Response to First Set of Interrogatories, Response to Interrogatory #5, Ex. III to Najib Decl.; Am. Compl. ¶ 16.) Yates has not been able to produce receipts for any of the allegedly missing items. (Yates Dep. at 148:3-19; Plaintiff's Response to First Set of Interrogatories, Response to Document Request #5, Ex. III to Najib Decl.) The whereabouts of the rabbit have not been ascertained (Yates Dep. at 205:13), but there is no indication in the record that Al the alligator was questioned in that regard. The Court suggests that he may be more knowledgeable on this issue than he has disgorged to date.

Yates filed a notice of claim against the NYPD and the City of New York in December 2003 alleging that "personal property and monies [were] stolen from my apartment, while the apartment was under police dept control." (Notice of Claim, Ex. D to Najib Decl.) The NYPD's Internal Affairs Bureau investigated Yates's allegation of theft and concluded it was "unsubstantiated." (Internal Affairs Bureau Investigative Findings dated Apr. 15, 2005, Ex. A to Affirmation of David Zelman dated Sept. 28, 2005.) Yates was later convicted in New York state court of reckless endangerment and sentenced to five months in prison. (Defs.' Rule 56.1 ¶¶ 195-196.) This federal action followed.

**III.    Discussion**

Yates's amended complaint, which refers to the NYPD's entries of his apartment on both October 4 and October 5, 2003 (Am. Compl. ¶¶ 1, 8-11), alleges that those searches were "unlawful" and "excessive" in violation of his rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. (Id. ¶¶ 29-33.) The amended complaint also alleges a state law claim of conversion and municipal liability based on the theory of respondeat superior. Defendants have moved for summary judgment on all claims.

**A. Summary Judgment Standard**

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995); LaFond v. Gen. Physics Serv., Corp., 50 F.3d 165, 171 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see LaFond, 50 F.3d at 171. However, the party opposing summary judgment – here, Yates – "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of his factual assertions opposing summary judgment. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); see Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); Stroud v. New York City, 374 F. Supp. 2d 341, 349 (S.D.N.Y. 2005). Yates must show that "there is sufficient evidence favoring [him] for a jury to return a verdict for [him]." Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir.

2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)) (internal quotation marks omitted).

**B. Federal Claim for "Illegal Search"**

Other than the fact that the police did not have a warrant when entering Yates's apartment on October 4 to first look for and then to remove the tiger, Yates has failed to provide any evidence – let alone evidence sufficient for a jury to return a verdict in his favor – that the NYPD's actions on either October 4 or 5 violated his constitutional rights. Rather, the evidence presented to the Court makes it manifest that defendants acted cautiously and reasonably in deciding to enter and search Yates's apartment and in conducting those searches.

*1. Defendants Are Entitled to Qualified Immunity for the October 4 Entries*

The police entered Yates's apartment twice on October 4: at approximately 1 a.m., they removed the peephole in the apartment's front door and lowered cameras from the windows of the apartment above Yates's; and that afternoon, they entered the apartment and removed the tiger from the premises. The NYPD did not have a warrant for either of these actions. The lack of a warrant is the only ground Yates cites as to why the NYPD's October 4 entries violated his constitutional rights.

The Fourth Amendment to the U.S. Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The "touchstone" of the Fourth Amendment is reasonableness. Florida v. Jimeno, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991); Anobile v. Pelligrino, 303 F.3d 107, 119 (2d Cir. 2001). "What a citizen is 'assured by the Fourth Amendment . . . is

10

not that no government search of his house will occur' in the absence of a warrant or an applicable exception to the warrant requirement, 'but that no such search will occur that is unreasonable.'" United States v. Lovelock, 170 F.3d 339, 343-44 (2d Cir. 1999) (quoting Illinois v. Rodriguez, 497 U.S. 177, 183, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) and citing Jimeno, 500 U.S. at 250)).

As a general rule, warrantless searches of an individual's home are unreasonable unless justified by probable cause and exigent circumstances. See Loria v. Gorman, 306 F.3d 1271, 1283 (2d Cir. 2002) ("The Supreme Court recently reiterated the firmly established rule that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'") (quoting Kirk v. Louisiana, 536 U.S. 635, 636, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002) (per curiam)); see also United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993); United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990) (en banc), cert. denied, 498 U.S. 1119 (1991) (While the "Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home, . . . [i]t is well-settled . . . that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay."). The question, therefore, is whether probable cause and exigent circumstances existed to justify the NYPD's October 4 warrantless intrusions into Yates's apartment.

There can be no dispute as to the existence of probable cause. The following facts are uncontroverted: before police officers removed the peephole in Yates's front door on October 4, they were notified not only that a tiger was living inside the apartment, but also that it had recently mauled a man; one of Yates's neighbors told police she had personal knowledge of the tiger and had previously had problems with large amounts of urine cascading from Yates's

11

apartment into her window; Yates's brother told police that Yates had both a tiger and a large alligator living inside the apartment and that he had fed the tiger the night before; and officers had visited Yates at Harlem Hospital, where he was recuperating from severe bite wounds. (Defs.' Rule 56.1 ¶¶ 25, 30-32; 35, 36; Polito Oct. 4 Report.) The police thus had "reasonably trustworthy information of facts and circumstances" that were sufficient to "warrant a person of reasonable caution" that a crime had been committed. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime"); Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999) (probable cause standard for a search is the same as that for an arrest). Specifically, reckless endangerment is a crime in New York, see N.Y.C.P.L. § 120.25, and possession of a wild animal is prohibited by the New York City health code, see 24 R.C.N.Y. Hlth. Code § 161.01.

Whether exigent circumstances were present is a more difficult question. The U.S. Court of Appeals for the Second Circuit has stressed that "the test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." MacDonald, 916 F.2d at 769, citing United States v. Schaper, 903 F.2d 891, 894 (2d Cir. 1990); see also Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998). The Second Circuit has identified a number of factors courts should consider in determining whether exigent circumstances justifying a warrantless entry are present: "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect

committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry." Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002). These factors are "intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account." Id. (quoting MacDonald, 916 F.2d at 770). The presence or absence of any single factor is not dispositive. Id. The "essential question" is "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." MacDonald, 916 F.2d at 769.

Applied here, and drawing all permissible factual inferences in Yates's favor, see Patterson, 375 F.3d at 219, these factors are not dispositive. The first factor – the nature of the offense – cuts both ways. From one perspective, the presence inside a Manhattan apartment building of a fully-grown Siberian tiger that the police knew had recently mauled its owner suggests an emergency situation meriting immediate action. From another perspective, however, with the doors to the apartment locked and no humans believed to be inside, the risk of further harm to the public does not leap out to the Court.

Weighing in favor of the existence of exigent circumstances is the fact that there was clear probable cause that a crime had been committed and that, at least insofar as the first entry is concerned – removing the peephole and lowering a camera from the apartment above – the NYPD's actions were peaceful, measured and restrained. On the other hand, the second entry, which involved cutting into the walls of the apartment and carrying out the tiger and alligator, was highly intrusive. In addition, the NYPD knew that Yates – the suspect – was not in his apartment but rather was at Harlem Hospital. He also was not armed. On balance, and considering the heavy burden the police must overcome to justify a warrantless entry into the

13

home, the Court concludes that a reasonable jurist potentially could find that exigent circumstances did not exist such as to excuse the warrant requirement. See Martin v. Tatro, No. 04-CV-800, 2005 WL 2489905, *4 (N.D.N.Y. Oct. 7, 2005); see also Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.").

The Court finds, however, that defendants are entitled to qualified immunity in regard to their October 4 actions because it was objectively reasonable for them to believe they were complying with the law. Qualified immunity "shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Even where a plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. Anthony v. City of New York, 339 F.3d 129 (2d Cir. 2003) (internal quotation marks and citations omitted). Police officers are immune from suit unless their judgment "was so flawed that no reasonable officer would have made a similar choice." Lennon v. Miller, 66 F.3d 416, 424-25 (2d Cir. 1995). The United States Supreme Court has held that even when law enforcement officers conduct a search without a warrant, they are protected by qualified immunity unless "in the light of pre-existing law[,] the unlawfulness [is] apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

Here, reasonable police officers in New York, if confronted with the facts known to defendants at the time, could disagree as to the legality of entering Yates's apartment without a warrant. In fact, the NYPD's actions on October 4 easily comply with the established New York standard set forth in People v. Mitchell, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976), for when an emergency justifies entering a home without a warrant. Thus, it cannot be said that pre-existing law made it apparent that the officers' actions were unlawful.

As articulated in People v. Mitchell, New York courts recognize an "emergency" exception to the warrant requirement when (1) the police have reasonable grounds to believe that there is an emergency at hand requiring immediate assistance; (2) the primary motive of the search is not to arrest or seize evidence; and (3) a reasonable basis exists to believe that the search will assist in resolving the emergency. 39 N.Y.2d at 177-78; see also Shapiro v. City of Glen Cove, No. CV 03-0280, 2005 WL 1076292, *14 (E.D.N.Y. May 5, 2005). Applied here, the first factor is met because the police, knowing that a tiger that had recently bitten its owner and had not been fed for at least 24 hours was stranded inside an apartment, had a reasonable basis to believe that immediate assistance was required. The fact that no people were in the apartment is of no consequence, as the Mitchell emergency doctrine encompasses threats of substantial imminent danger to "property," see Mitchell, 39 N.Y.2d at 178, as well as the need to rescue animals in danger, see People v. Rogers, 184 Misc.2d 419, 420, 708 N.Y.S.2d 795 (N.Y. App. 2d Dept. 2000) (police justified in rescuing animals from a pet store without a warrant); Shapiro, 2005 WL 1076292 at *14 (warrantless search not unconstitutional because police believed there was an urgent need to rescue dogs stranded in a building).

The police complied with the second Mitchell factor by limiting their October 4 actions to what was necessary to resolve the emergency – removing the peephole to try to locate the tiger

15

and then rescuing the tiger – and waiting until after securing a warrant on October 5 to search the apartment for further evidence of wrongdoing. The third factor is met because it was reasonable for the NYPD to believe that all of the steps they took on October 4, including cutting through the apartment's walls in order to pinpoint the tiger's exact location, would "assist in resolving the emergency." See Mitchell, 39 N.Y.2d at 178. Thus, defendants' actions on October 4 were in accordance with established New York law. There can be no question, therefore, that it was objectively reasonable for the officers to believe that their actions were lawful. Accordingly, defendants' October 4 searches are protected by qualified immunity.

*2. Defendants Had a Valid Warrant for the October 5 Search*

The NYPD's search of Yates's apartment on October 5, 2003 is presumptively reasonable because the officers were operating pursuant to a warrant issued by an independent magistrate. See Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991); Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994); Barber v. Winn, No. 95-CV-1030, 1997 WL 151999, *6 (N.D.N.Y. Mar. 31, 1997). Nevertheless, Yates asserts that the October 5 search was unconstitutional because: (1) Detective Ortiz misled the magistrate who issued the warrant, rendering the warrant invalid; (2) the warrant and the ensuing search were "patently overbroad and excessive"; and (3) the warrant and search were "needlessly cumulative" given that the tiger had already been removed from the apartment. (Pl.'s Opp. at 2-10.) Each of these reasons fails to withstand scrutiny.

First, Ortiz did not mislead the magistrate. His affidavit in support of the warrant stated that there was "reasonable cause to believe" that Yates's apartment would contain "documents of ownership of and purchasing of exotic animals, medical record for exotic animals, enclosures or cages for exotic animals and evidence of the crimes of Reckless Endangerment, PL 120.25, and

16

Possession of a Wild Animal, NYCC 161.01, including but not limited to . . . receipts for goods and services tending to demonstrate cash transactions or financial transfers relating to the possession of exotic animals." Given that the police had just removed a fully grown Siberian tiger and a six-foot-long alligator from the apartment, and that Yates had admitted to Ortiz that he had owned many wild animals in the past, including monkeys, alligators, and scorpions, Ortiz's assertion of "reasonable cause" was plainly accurate. Yates maintains that Ortiz had no basis for his statement that the apartment may contain evidence of "financial transfers relating to the possession of exotic animals." (Pl.'s Opp. at 4-6.) This contention is belied by the fact that Yates had told Ortiz that he had purchased Ming from a woman in Minnesota for $3,500. (See Reckless Endangerment Report dated Oct. 4, 2003, Ex. L to Najib Decl.)

Second, the warrant was not overbroad or excessive because it limited the seizure of property to specific items relating to the "ownership and purchasing of exotic animals" and "ownership and use of the target premises to possess exotic animals." (See Search Warrant, Ex. R to Najib Decl.) Such specificity was sufficient to enable the officers to "ascertain and identify with reasonable certainty the items to be seized." United States v. George, 975 F.2d 72, 75 (2d Cir. 1992) (citing Steele v. United States, 267 U.S. 498, 503-04, 45 S. Ct. 414, 69 L. Ed. 757 (1925)); see also United States v. Vargas, 621 F.2d 54, 56 (2d Cir.), cert. denied, 449 U.S. 854, 101 S. Ct. 150, 66 L. Ed. 2d 68 (1980); United States v. LaChance, 788 F.2d 856, 874 (2d Cir.) cert. denied, 479 U.S. 883, 107 S. Ct. 271, 93 L. Ed. 2d 248 (1986). Furthermore, there is no indication that defendants searched for or recovered any evidence that was outside the ambit of the warrant. (See Defs.' Rule 56.1 ¶ 129 ("Officers recovered photographs, a certificate of veterinary inspection, acquisition record/sale receipt, bullets and assorted papers from inside the apartment"); Pl.'s Response to Defs.' Rule 56.1 Statement ¶ 129 ("admit"); Deposition of Jose

17

Ortiz dated June 3, 2005, Ex. B. to Najib Decl. at 30:18-31:18; Property Clerk's Invoices, Ex. X to Najib Decl.)

Yates's final argument is that because the police had already recovered the tiger and alligator, the October 5 search of his apartment was "needlessly cumulative," as the police already had "ample evidence" to prove reckless endangerment and possession of a wild animal. (Pl.'s Opp. at 9-10.) Yates cites as support for this contention <u>San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose</u>, 402 F.3d 962, 972 (9th Cir. 2005), in which the police, authorized to search for indicia of Hells Angels affiliation as part of a sentencing enhancement determination, seized "literally truckloads" of items containing the Hells Angels insignia. In upholding the denial of the defendants' summary judgment motion, the United States Court of Appeals for the Ninth Circuit noted that "[w]hile additional evidence would usually show the breadth of criminal activity, in the instant case additional evidence would at some point have no additional probative value in determining membership." <u>Id.</u> Here, on the other hand, the NYPD could not have been certain of the extent or breadth of Yates's criminal undertakings solely through the seizure of the tiger and alligator. Yates had indicated to Detective Ortiz that he had owned other wild animals in the past – a fact that could not be proven merely by the existence of the tiger and alligator in the apartment. The October 5 search, therefore, was not needlessly cumulative because the evidence ordered to be seized had additional probative value in determining the extent of Yates's criminal activity.

Yates has therefore offered no evidence or legal ground supporting his claim that the October 5, 2003 search of his apartment was unreasonable. Thus, no reasonable juror could find that the search violated Yates's rights pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution. Accordingly, and because defendants are protected by qualified immunity for

their October 4, 2003 actions, defendants' motion for summary judgment on Yates's federal cause of action for an "illegal search" is granted.

## C. State Claims

Yates brings two "claims" pursuant to state law: he sues New York City on the theory that the municipality is liable for the acts of its employees and he sues defendants for allegedly converting the missing cash, jewelry, rabbit and "manuscript." However, this Court declines, pursuant to 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over those state law claims. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994).

## IV. Conclusion

Defendants' summary judgment motion is granted because the NYPD's actions in entering Yates's apartment to look for and remove the tiger without a warrant on October 4, 2003 were objectively reasonable; Yates has presented no evidence that would permit a reasonable juror to conclude that the subsequent search of his apartment on October 5, 2003 with a warrant violated his Fourth or Fourteenth Amendment rights; and the Court declines to exercise jurisdiction over Yates's state law claims. The Clerk of Court is directed to enter judgment dismissing the complaint.

Dated: New York, New York
August 4, 2006

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.